IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FCA US LLC,<br><br>        Plaintiff,<br><br>v.<br><br>THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",<br><br>        Defendants. | Case No. 25-cv-09408 |

## COMPLAINT

Plaintiff FCA US LLC ("FCA" or "Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, the "Defendants") and alleges as follows:

### I. JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b), and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores[1] operating under the seller aliases identified in Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States

---

[1] The e-commerce store URLs are listed on Schedule A hereto under the Online Marketplaces.

consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts, and, on information and belief, have sold products using infringing and counterfeit versions of Plaintiff's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

## II. INTRODUCTION

3. This action has been filed by Plaintiff to combat e-commerce store operators who trade upon Plaintiff's reputation and goodwill by offering for sale and/or selling unauthorized and unlicensed products, namely automotive accessories, using infringing and counterfeit versions of Plaintiff's federally registered FCA trademarks (the "Counterfeit Products"). Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale, and selling Counterfeit Products to unknowing consumers. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of its registered FCA trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet. Plaintiff has been and continues to be irreparably damaged through consumer confusion, dilution, and tarnishment of its valuable FCA trademarks as a result of Defendants' actions and seeks injunctive and monetary relief.

## III. THE PARTIES

4. In January of 2021, Peugeot S.A. merged with and into Fiat Chrysler Automobiles N.V., with Fiat Chrysler Automobiles N.V., as the surviving company in the merger. The combined company was renamed Stellantis N.V. ("Stellantis"). FCA US LLC is a wholly owned indirect subsidiary of Stellantis. FCA US LLC and Stellantis are referred to herein together or individually as "FCA."

5. FCA is a multinational automotive manufacturing corporation and is one of the largest automakers in the world, with millions of vehicles sold in the United States and globally, resulting in billions of dollars in revenue.

6. FCA is associated with some of the most famous brands in the automotive industry, including Chrysler, Dodge, Fiat, Jeep, Lancia, Maserati, Opel, Peugeot, Ram, Vauxhall, Alfa Romeo, and Citroen.

7. Propelled by its reputation and recognizable trademarks, which are carefully curated and monitored, consumers recognize Plaintiff and the FCA brands as a source of reliable and quality vehicles, vehicle parts, and accessories (collectively, the "FCA Products"). FCA has registered many of its trademarks with the United States Patent and Trademark Office. FCA Products typically include at least one of FCA's registered trademarks. FCA uses its trademarks in connection with the marketing of its FCA Products, including the following marks which are collectively referred to as the "FCA Trademarks."

| Registration Number | Trademark |
|---|---|
| 570186 | CHRYSLER |
| 1193586 | PLYMOUTH |
| 2861480 | 300C |
| 3941344 | (Chrysler wings logo) |

| | |
|---|---|
| 801717 | |
| 1189233 | DODGE |
| 3538635 | CHALLENGER |
| 2985653 | CHARGER |
| 1800654 | VIPER |
| 4325240 | DART |
| 5839879 | SCAT PACK |
| 3264572 | SUPER BEE |
| 3098722 | SRT |
| 3209150 | R/T |
| 2999082 | |
| 5382204 | |
| 4831385 | |
| 4696903 | |
| 3264573 | |
| 2760226 | |
| 2994818 | |

| | |
|---|---|
| 3053379 | [grille design] |
| 1741153<br>3018766 | HEMI |
| 2994481<br>2983053 | MOPAR |
| 383304 | MOPAR |
| 2919922 | [Mopar omega logo] |
| 3806969 | RAM |
| 3071692 | BIG HORN |
| 1973148 | LARAMIE |
| 4946811 | REBEL |
| 6289815 | TRX |
| 3160030 | [grille design] |
| 2970629 | [grille design] |
| 2593670 | [grille design] |
| 0526175<br>1130015<br>1134153<br>1236540<br>2512866<br>2849309<br>4091155 | JEEP |
| 1557843 | WRANGLER |
| 4518178 | CHEROKEE |
| 1415771 | RENEGADE |
| 2666854 | RUBICON |
| 6992182 | Jeep [with paw prints] |

| | |
|---|---|
| 4272873 | |
| 2975740 | |
| 1170088 | |
| 3199299 | |
| 4043984 | |
| 2924936 | |
| 2794553 | |
| 1433760 2732021 | |
| 2823099 | |
| 2764249 | |

8. The above U.S. registrations for the FCA Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the FCA Trademarks constitute prima facie evidence of their validity and of FCA's exclusive right to use the FCA Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the United

6

States Registration Certificates for the above-listed FCA Trademarks are attached hereto as **Exhibit 1**.

9. The FCA Trademarks are distinctive when applied to the FCA Products, signifying to the purchaser that the products come from FCA and are manufactured to FCA's quality standards. Whether FCA manufactures the products itself or contracts with others to do so, FCA has ensured that products bearing the FCA Trademarks are manufactured to the highest quality standards.

10. The FCA Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1), and have been used by FCA for many years. The innovative marketing and product designs of the FCA Products have enabled the FCA brands to achieve widespread recognition and fame and have made the FCA Trademarks some of the most well-known marks in the automotive industry. The widespread fame, outstanding reputation, and significant goodwill associated with the FCA brands have made the FCA Trademarks valuable assets of FCA.

11. FCA has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the FCA Trademarks. In fact, FCA has expended millions of dollars annually in advertising, promoting, and marketing featuring the FCA Trademarks. FCA Products have also been the subject of extensive unsolicited publicity resulting from their high quality, performance, and innovative design. As a result, products bearing the FCA Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from FCA. FCA Products have become among the most popular of their kind in the U.S. and the world. The FCA Trademarks have achieved tremendous fame and recognition which has only added to the distinctiveness of the marks. As such, the goodwill associated with the FCA Trademarks is of incalculable and inestimable value to FCA.

12. FCA Products are sold to consumers through authorized dealerships, including several in the Chicago area. FCA has a website at stellantis.com which allows customers to search the FCA brands and find official websites for the associated brands. The stellantis.com website features proprietary content, images, and designs exclusive to FCA.

**The Defendants**

13. Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiff. On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions, or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

14. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operations make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

15. The success of the FCA brands has resulted in significant counterfeiting of the FCA Trademarks. Consequently, FCA has a worldwide anti-counterfeiting program and regularly investigates suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers. In recent years, FCA has identified numerous fully interactive, e-commerce stores offering Counterfeit Products on online marketplace platforms such as PayPal, Amazon, eBay,

Temu, and Walmart, including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. At last count, global trade in counterfeit and pirated goods was worth an estimated $467 billion per year — accounting for a staggering 2.3% of all imports, according to the Organization for Economic Cooperation and Development (the "OECD").[2] The primary source of all those counterfeits, the OECD and others say, is China.[3]

16. Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms."[4] Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts.[5] Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated.[6] Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters."[7]

---

[2] *See* Press Release, Organization for Economic Cooperation and Development, *Global trade in fake goods reached USD 467 billion, posing risks to consumer safety and compromising intellectual property* (May 7, 2025), https://www.oecd.org/en/about/news/press-releases/2025/05/global-trade-in-fake-goods-reached-USD-467-billion-posing-risks-to-consumer-safety-and-compromising-intellectual-property.html.

[3] *Id.*; *See also, Intellectual Property Rights Seizure Statistics, Fiscal Year 2024*, U.S. Customs and Border Protection.

[4] *See* Daniel C.K. Chow, Alibaba, Amazon, and Counterfeiting in the Age of the Internet, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); see also report on U.S. DEPARTMENT OF HOMELAND SECURITY, OFFICE OF STRATEGY, POLICY, AND PLANS, COMBATING TRAFFICKING IN COUNTERFEIT AND PIRATED GOODS at 22 (2020 ), and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary.

[5] COMBATING TRAFFICKING IN COUNTERFEIT AND PIRATED GOOD, *supra* note 4, at 22.

[6] *Id.* at 39.

[7] Chow, *supra* note 4, at 186-87.

17. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts and, on information and belief, have sold Counterfeit Products to residents of Illinois.

18. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales of Counterfeit Products by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it difficult for consumers to distinguish such stores from an authorized retailer. On information and belief, FCA has not licensed or authorized Defendants to use any of the FCA Trademarks in the United States, and none of the Defendants are authorized retailers of genuine FCA Products.

19. Many Defendants also deceive unknowing consumers by using one or more FCA Trademarks without authorization within the content, text, and/or meta-tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to consumer searches for FCA Products. Other e-commerce stores operating under Seller Aliases omit using FCA Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for FCA Products.

20. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

21. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

22. Defendants are collectively causing harm to Plaintiff's goodwill and reputation because the effect of their unlawful actions taken together amplifies each harm and creates a single negative consumer impression. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. The combination of all Defendants engaging in the same illegal activity in the same time span causes a collective harm to Plaintiff in a way that individual actions, occurring alone, might not.

23. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

24. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Plaintiff's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move

funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiff. Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

25. Defendants are working to knowingly and willfully import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from FCA, have knowingly and willfully used and continue to use the FCA Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Products into the United States and Illinois over the Internet.

26. Defendants' unauthorized use of the FCA Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including the sale of Counterfeit Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

27. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

28. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered FCA Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The FCA Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from FCA Products sold or marketed under the FCA Trademarks.

29. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the FCA Trademarks without FCA's permission.

30. FCA is the exclusive owner of the FCA Trademarks. FCA's United States Registrations for the FCA Trademarks (**Exhibit 1**) are in full force and effect. On information and belief, Defendants have knowledge of FCA's rights in the FCA Trademarks and are willfully infringing and intentionally using counterfeits of the FCA Trademarks. Defendants' willful, intentional, and unauthorized use of the FCA Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Products among the general public.

31. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

32. FCA has no adequate remedy at law and, if Defendants' actions are not enjoined, FCA will continue to suffer irreparable harm to its reputation and the goodwill of its well-known FCA Trademarks.

33. The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

34. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

35. Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the

13

general public as to the affiliation, connection, or association with FCA or the origin, sponsorship, or approval of Defendants' Counterfeit Products by FCA.

36. By using the FCA Trademarks in connection with the sale of Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

37. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

38. There is no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the associated goodwill of the FCA brand.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily and permanently enjoined and restrained from:

    a. using the FCA Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, promotion, marketing, advertising, offering for sale, or sale of any product that is not a genuine FCA Product or is not authorized by FCA to be sold in connection with the FCA Trademarks;

    b. passing off, inducing, or enabling others to sell or pass off any products as genuine FCA Products or any other products produced by FCA that are not FCA's, or not

        produced under the authorization, control, or supervision of FCA and approved by FCA for sale under the FCA Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control, or supervision of FCA, or are sponsored by, approved by, or otherwise connected with FCA;

   d. further infringing the FCA Trademarks and damaging FCA's goodwill; and

   e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for FCA, nor authorized by FCA to be sold or offered for sale, and which bear any of FCA's trademarks, including the FCA Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

2) Entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as PayPal, Amazon, eBay, Temu, and Walmart (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the FCA Trademarks;

3) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the FCA Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Plaintiff be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the FCA Trademarks;

15

5) That Plaintiff be awarded its reasonable attorneys' fees and costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 8th day of August 2025.  Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Berel Y. Lakovitsky
Hannah A. Abes
Greer, Burns & Crain, Ltd.
200 West Madison Street, Suite 2100
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
blakovitsky@gbc.law
habes@gbc.law

*Counsel for Plaintiff FCA US LLC*